STATE OF NORTH CAROLINA v. JOHN ERIC MARTIN aka JOHN ERIC
MARTIN, JR. and CHARLES ALVIN BROWN

No. 56A83

(Filed 3 November 1983)

1. **Criminal Law § 34.8— evidence of other crimes—offer to establish plan or design or intent properly admitted**

    The trial court properly admitted into evidence testimony concerning defendants' abandoned attempt to rob merchants at Eastland Mall in Charlotte where the testimony showed that upon deciding that there were circumstances at Eastland Mall unfavorable to the successful execution of the planned crime, the plan was abandoned, and within minutes the same parties were engaged in a plan which resulted in the armed robbery of a Handy Pantry store and the felony murder of an officer. The evidence elicited by the defendants concerning their hesitancy to engage in the charged crimes emphasized the relevancy of the challenged evidence which tended to show intent and the existence of a plan and design among defendants and their confederates to obtain money by means of a robbery.

2. **Conspiracy § 5.1— criminal conspiracy—admissibility of statements of co-conspirators**

    The trial court properly permitted testimony of two co-conspirators concerning conversations which tended to establish the conspiracy to commit the crime of armed robbery. In North Carolina the testimony of a co-conspirator is competent to establish the conspiracy, and a conspirator's unsupported testimony is sufficient to sustain a verdict although the jury should receive and act upon such testimony with caution.

3. **Criminal Law § 79— statements of co-conspirator—not expression of opinion— shorthand statements of fact**

    Testimony by a co-conspirator that defendants went across the street "to wait on us," did not constitute an expression of opinion by a lay witness, rather the witness was merely reiterating his prior admissible testimony as to what defendants had told him. The witness's response as to why defendants were going to wait was not an expression of opinion as to their intent; rather, it was simply a recitation of the sequence of events as seen and heard by the witness. The inference drawn by the witness flowed naturally and logically from the facts and circumstances about which he testified.

4. **Criminal Law § 86.10— prior statement of witness—corroboration**

    The trial judge properly admitted a witness's prior written statement into evidence where the statement corroborated his in-court testimony.

5. **Criminal Law § 42.4— evidence relating to weapons properly admitted**

    The trial judge properly allowed a witness to testify that he saw two pistols in the possession of one defendant and an accomplice on the day following the armed robbery. The answer of the witness was responsive and could not reasonably be interpreted as implying who might be the owner of the weapons.

6. **Criminal Law § 79— acts of co-conspirators—not intended as declarations—admissible into evidence**

The trial judge did not err in permitting evidence of the sale of the murder weapon and the slain officer's pistol by co-conspirators on the day following the commission of the charged crime since the evidence involved *acts* obviously not intended as declarations, and since the evidence was relevant to show guilty knowledge and an attempt to suppress evidence.

7. **Conspiracy § 6; Homicide § 25.1; Robbery § 4.5— conspiracy to commit armed robbery—felony murder—sufficiency of evidence**

The trial judge properly denied defendants' motions to dismiss the charges of armed robbery, first degree murder, and conspiracy where the evidence tended to show that six men formed a plan to rob the Handy Pantry store; defendants Brown and Martin agreed to wait across the street in an automobile for the individuals who agreed to commit the actual robbery; defendants Martin and Brown circled the block in the automobile while the robbery was in progress and fled the scene only after hearing shots and observing police cars coming to the scene; that although there was some hesitancy on the part of Martin and Brown about taking part in the robbery, after it was agreed that others would enter the store, they remained outside the store either parked or circling the block while the others entered the store and committed the crimes of armed robbery and first-degree murder; that when Brown and Martin fled the scene they went to another conspirator's apartment; that Martin told the other conspirator's wife, "We went to make a lick, and me and Charlie Brown was at some store. We were supposed to be circling."; that Martin further stated that upon hearing shots and seeing police cars, they left the scene; that the other conspirator later came to his apartment, and he told Martin that he should not have left them; and that both Martin and Brown shared in the proceeds of the robbery.

8. **Criminal Law § 26.5; Homicide § 4.2— felony murder—additional punishment for armed robbery improper**

The commission of the crime of armed robbery was the basis for the conviction of defendants for first degree murder; therefore, no additional punishment may be imposed for the convictions of armed robbery as independent criminal offenses.

APPEAL by defendants from *Kirby, Judge,* at 20 September 1982 Schedule "D" Criminal Session of MECKLENBURG County Superior Court.

Defendants Martin and Brown were charged in separate indictments with first-degree murder of Police Officer Edmond Cannon, conspiracy to commit armed robbery and armed robbery. Each defendant entered a plea of not guilty to each charge and upon motion by the State all cases were consolidated for trial.

The State offered evidence tending to show that on the night of 23 November 1981, Mark Anthony Owens, Ameen Kareem Abdullah, Charles Alvin Brown, John Eric Martin, Jr., Antonio Randolph, and Richard Washington were at Martin's home where they had a conversation concerning going to Eastland Mall in Charlotte, North Carolina, to steal bank deposit bags from merchants after the mall closed. Pursuant to their conversation, the six men drove to the mall in separate cars, but their plan to steal the deposit bags was abandoned because they observed a plainclothes detective in the mall. Upon leaving the mall, they observed a Handy Pantry store located at the intersection of Kilborne and Eastway Drives.

The two cars pulled behind the store, and a conversation ensued as to whether they should rob the store. There was evidence that defendants Brown and Martin indicated that they did not want to carry out the planned robbery. However, Abdullah, Owens, and Randolph entered the convenience store to commit the armed robbery. Abdullah was armed with a small dark pistol. Neither Owens nor Randolph was armed. The Thunderbird automobile, driven by Washington, was positioned on the street behind the Handy Pantry. There was conflicting evidence as to whether the station wagon occupied by Brown and Martin was positioned across the street from the Handy Pantry or whether Brown and Martin were circling the block. There was also testimony tending to show that the men in each automobile were to act as lookouts and getaway drivers.

At approximately 10:00 o'clock p.m., Abdullah entered the store first. He pulled his pistol on Wendy Jenkins, the store clerk, and placed her in the cooler at the back of the store. Owens and Randolph entered the store and at Abdullah's direction removed the money from the cash register. At this point, Officer Edmond Cannon of the Charlotte Police Department pulled his marked police car in front of the Handy Pantry. Cannon was in uniform and had a silver service revolver in his holster.

Cannon entered the store and observed Abdullah, Owens, and Randolph. He asked where the store clerk was. Abdullah told Cannon that she was getting something for him at the back of the store. Abdullah tried to leave. Cannon pushed Abdullah back and told him not to leave. At this point, the store clerk pushed the cooler door open and called for help.

Abdullah pulled his pistol and shot Cannon. After the first shot was fired, Officer Cannon, who had not drawn his pistol, stumbled out the door and fell on the ground. Abdullah continued to fire. There was medical testimony which indicated that two bullets struck Cannon in the arm. One passed through his arm and grazed his chest. Three bullets penetrated Cannon's back, and one of these bullets pierced his heart causing his death.

Abdullah, Owens, and Randolph fled. They ran to Washington's car and sped away from the scene. In the car, Abdullah showed Owens Officer Cannon's service revolver which he had taken from Cannon as he lay on the pavement.

Martin and Brown fled when they heard the shots and observed police cars. They immediately went to the home of Tonya Abdullah, wife of Ameen Kareem Abdullah. At approximately 10:30 o'clock p.m. Martin and Brown arrived. Tonya Abdullah testified:

> . . . I was on the couch and it was in the middle of the late show when I heard a knock on the door. John Martin and Charlie Brown were knocking on the door. When I got up to open the door, John Martin was in front, Charlie Brown was in the back. They came in fast, I remember that because they almost pushed me the way they came in. When John first came in, I asked him where was Kareem, and he said, "Oh, s---, everything's f----- up." Then John Martin and Charlie Brown were trying to talk at the same time. I asked John what had happened and he said, "We went to make a lick and me and Charlie Brown was at some store, we were supposed to be circling. We were circling around the store and we heard some bullets. Shots. So we came back, and as we were coming, we seen police cars going toward the store." Charlie Brown told John Martin in my presence that was no reason to leave them and John responded asking Charlie Brown if he didn't see all the police cars and that the place was soon going to be swarming with police. I do not remember anything else that was said between the two of them that night. They stayed at my house about one or two hours. About thirty minutes after John Martin and Charlie Brown arrived, my husband and Skillet (Mark Owens) and Wheaty (Antonio Randolph) came in. John Martin and Charlie Brown were still

there. When I opened the door, Kareem went over to grab John and told him he shouldn't have left them. John did not say anything to Kareem. Charlie Brown was there when this happened and said, "Man, I told him he shouldn't have left."

Vermerial Bennett, Tonya Abdullah's sister, was present when Martin and Brown arrived and testified that:

On November 23rd of last year, I saw John Martin and Charlie Brown in the later evening hours at my house with my sister, Tonya Abdullah. They were knocking at the door and I went to the door and opened it and they came in talking. John Martin said, "We went to make a lick," and my sister asked where was Abdullah. John said, "We had to leave him because the police came." And Charlie Brown said, "Man, I told you we shouldn't have left them." I also remember John Martin said, "Man, all those cops," and that is why they left. John Martin and Charlie Brown were at the house about fifteen minutes that night and they left. They came back later and Abdullah was with them. Martin, Brown, my sister and me, Skillet, Wheaty and Abdullah were in the house when Abdullah said, "Man, why did you leave us? We could have got caught." I do not remember anyone saying anything back to Abdullah. I do not remember anything else that either Charlie Brown or John Martin said that night.

Later that night, the six men met at John Martin's house where they split the proceeds of the robbery. Each man received about $16.00 from the proceeds of the robbery.

The following day, Owens, Martin, and Abdullah went to Chester, South Carolina, where the murder weapon and Officer Cannon's service revolver were sold to Clarence Buchanan for $70.00 in cash and some marijuana.

Defendants offered no evidence.

The jury returned verdicts of guilty as charged on all counts. The trial judge entered judgment imposing upon each defendant a sentence of life imprisonment upon the verdict of guilty of first-degree murder, a sentence of imprisonment for one year upon the verdict of guilty of conspiracy to commit armed robbery, and a sentence of imprisonment for fourteen years on the verdict of

guilty of armed robbery. Each defendant appealed to this Court as a matter of right on the murder convictions, and on 31 May 1983, we allowed their respective motions to bypass the Court of Appeals on the armed robbery and conspiracy convictions.

*Rufus L. Edmisten, Attorney General, by Thomas F. Moffitt, Assistant Attorney General, for the State.*

*Marshall H. Karro for defendant appellant John Eric Martin, Jr.*

*Richard H. Tomberlin for defendant appellant Charles Alvin Brown.*

BRANCH, Chief Justice.

[1] Defendants contend that the trial judge erred by admitting into evidence testimony concerning their abandoned attempt to rob merchants at Eastland Mall in Charlotte, North Carolina.

It is well settled in North Carolina that the State cannot offer evidence of other crimes committed by an accused where the only relevancy of such evidence is its tendency to show the defendant's disposition to commit a crime of the nature of the one for which he is on trial. *Accord, State v. Williams,* 304 N.C. 394, 284 S.E. 2d 437 (1981); *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* 448 U.S. 907 (1980); *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954). However, there are numerous exceptions to this rule which include evidence tending to show intent or the existence of a plan or design to commit the offense charged. *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979); *State v. Greene,* 294 N.C. 418, 241 S.E. 2d 662 (1978). Evidence offered for the purpose of showing intent or the existence of a plan or design should be carefully scrutinized before it is admitted to insure that it is really relevant to the establishment of plan or design or intent rather than merely to show propensity to commit the offense charged. *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510; *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364; 1 Brandis on North Carolina Evidence, § 92 (2d Rev. Ed. 1982).

Here the evidence discloses that the defendants entered into a plan with other persons to commit a robbery in Eastland Mall. Upon deciding that there were circumstances at Eastland Mall unfavorable to the successful execution of the planned crime, this

plan was abandoned. Within minutes the same parties were engaged in a plan which resulted in the armed robbery of the Handy Pantry store and the felony murder of Officer Cannon. The evidence elicited by the defendants concerning their hesitancy to engage in the charged crimes emphasizes the relevancy of the challenged evidence which tends to show intent and the existence of a plan and design among defendants and their confederates to obtain money by means of a robbery.

This assignment of error is overruled.

[2] Defendants next assign as error the rulings of the trial judge permitting co-conspirators Randolph and Owens to testify as to conversations among the six men on 23 November 1981, which conversations tended to establish the conspiracy to commit the crime of armed robbery.

It is defendants' position that without additional extrinsic evidence the State cannot prove the existence of a criminal conspiracy by the in-court testimony of other co-conspirators. We disagree.

It is well established in North Carolina that the testimony of a co-conspirator is competent to establish the conspiracy. *State v. Carey*, 285 N.C. 497, 206 S.E. 2d 213 (1974); *State v. Miley*, 291 N.C. 431, 230 S.E. 2d 537 (1976). Further, a conspirator's unsupported testimony is sufficient to sustain a verdict although the jury should receive and act upon such testimony with caution. *State v. Carey*, 285 N.C. 497, 206 S.E. 2d 213; *State v. Tilley*, 239 N.C. 245, 79 S.E. 2d 473 (1954).

Here the State offered the co-conspirators Owens and Randolph as witnesses. Obviously, such testimony does not involve the use of acts and declarations of one conspirator against another. To the contrary, it is direct, sworn, in-court testimony of one conspirator against another. This evidence was competent and admissible on the question of defendants' guilt or innocence of the charged crimes.

[3] Defendants next contend that the trial judge erred in permitting the witness Owens to testify concerning the roles of defendants Martin and Brown in the robbery of the Handy Pantry store and the murder of Officer Cannon. Defendants argue that the

State v. Martin

challenged testimony constituted an inadmissible opinion of the witness as to the intent of defendants.

The testimony which defendants contend was erroneously admitted appears in the record as follows:

Q. If you know, where did Martin and Brown go when you went to rob the Store and why?

MR. TOMBERLIN: Objection.

MR. KARRO: Objection.

COURT: Overruled.

DEFENDANTS' MARTIN AND BROWN EXCEPTION NUMBER NINETEEN (19).

A. Across the street to wait on us.

MR. TOMBERLIN: Motion to strike.

MR. KARRO: Motion to strike.

Q. To do what?

A. To wait on us.

MR. TOMBERLIN: Motion to strike.

COURT: Motion to strike denied.

DEFENDANTS' BROWN AND MARTIN EXCEPTION NUMBER TWENTY (20).

Q. Why were they going to wait on you?

A. Well, from what I understand —

MR. KARRO: Objection.

MR. TOMBERLIN: Objection.

COURT: Sustained as to what he understood.

Q. Why were they going to wait on you?

MR. TOMBERLIN: Objection.

MR. KARRO: Objection.

COURT: Overruled.

DEFENDANTS' BROWN AND MARTIN EXCEPTION NUMBER
TWENTY-ONE (21).

A. So that some of us could get in the station wagon and
leave.

Prior to the admission of the questioned evidence, Owens had
testified as follows:

A. The cars were beside one another behind the Handy Pan-
try. Both cars had the windows rolled down on the passen-
ger's side and on the driver's side. The station wagon had the
driver's side rolled down, the station wagon had the passen-
ger's side rolled down, and we were discussing the matter
from the two cars there. Three of us were in one car and
three of us were in the other car.

Q. All right, describe what the conversation was.

MR. TOMBERLIN: Objection.

THE COURT: Overruled.

A. Whether or not to go into the Handy Pantry Store and
rob it.

DEFENDANT'S BROWN EXCEPTION NUMBER SIX (6).

A. I remember Richard saying that he really didn't want to
go in; but Abdullah said it's too late now. We have come too
far so we might as well go ahead with it. Well John and
Charlie, they really weren't too particular about going in but
since Abdullah persuaded us to go along with him so. . . .

MR. KARRO: Objection to us, move to strike.

Q. When you say us, who are you referring to?

A. Antonio, Richard, myself, John Martin, Charlie Brown and
Abdullah.

THE COURT: (Overruled). Mr. Tomberlin's same objection.

DEFENDANTS' MARTIN AND BROWN EXCEPTION NUMBER
SEVEN (7).

Charlie, John and Richard, there was a conflict on whether or
not they were going in or not. They said they didn't want to

go in but Abdullah said that it was too late. Abdullah said it was too late to turn back and Charlie Brown and John Martin said they would wait across the street for us when we came out of the store. Abdullah told me and Antonio to come into the store with him and then Richard was to park the car in the neighborhood behind the store, park the car and wait for us to come out.

We briefly review the cases upon which defendant relies to support his position.

In *State v. Smith*, 300 N.C. 71, 265 S.E. 2d 164 (1980), a trial judge overruled defendant's objection to testimony that a weapon "looked to me like it was probably the caliber of a .38." This Court found no error in the trial judge's ruling and, in pertinent part, stated:

Opinion evidence is inadmissible whenever the witness can relate the facts so that the jury will have an adequate understanding of them, and the jury is as well qualified as the witness to draw inferences and conclusions from the facts. *See generally* 1 Stansbury's North Carolina Evidence § 124 (Brandis Rev. 1973). However, it is well settled that opinion evidence is always admissible when the facts on which the opinion or conclusion is based cannot be so described that the jury will understand them sufficiently to be able to draw their own inferences. *E.g., State v. Watson*, 287 N.C. 147, 214 S.E. 2d 85 (1975); *see also* 1 Stansbury's North Carolina Evidence § 125 (Brandis Rev. 1973). Implicit in the rule is the recognition that the limitations of the language may make it difficult or impractical for a witness to describe the facts in detail. *Tyndall v. Harvey C. Hines, Co.*, 226 N.C. 620, 39 S.E. 2d 828 (1946); *State v. Dills*, 204 N.C. 33, 167 S.E. 459 (1933).

The defendant in *State v. Harrelson*, 54 N.C. App. 349, 283 S.E. 2d 168 (1981), sought to offer his opinion as to whether "George was on defendant's 'side' or Owens' 'side'" at the time a shooting occurred. The trial judge sustained the State's objection and excluded the testimony. The Court of Appeals found no error on the basis that the question required defendant, a lay witness, "to draw a conclusion as to what George . . . was thinking." *Id.*

Defendant in his brief relies upon the following quote from *State v. Brower*, 289 N.C. 644, 224 S.E. 2d 551 (1976): "It is true that ordinarily a witness may not give his opinion of another person's intention." *Id.* at 661, 224 S.E. 2d at 563.

In *Brower*, this Court held that it was not error for the trial judge to permit a witness to testify that defendant Brower "went over with [a codefendant] to assist him." In so holding, we stated:

> Defendant Brower next argues under this assignment that the trial court erred in allowing the State's witness Wade Burris to testify over objection that after the shorter of the two robbers, identified as Brower, forced Mr. Burris and Mrs. Hall to lie on the floor and after he took Mr. Burris's pocketbook, the shorter man "went over with the taller man [identified as defendant Johnson] *to assist him.*" (Emphasis added by the court.) Defendant contends the witness was thus erroneously permitted to draw inferences concerning defendant's intention. We find no merit in this argument. It is true that ordinarily a witness may not give his opinion of another person's intention. 1 Stansbury North Carolina Evidence § 129. (Brandis rev. 1973), and cases cited therein. Nevertheless, the witness Burris was not expressing his opinion that Brower intended to assist defendant Johnson. Rather, the statement was simply a narration of the sequence of events during the commission of the crime. It was a shorthand statement of fact. (Citations omitted.)

*Id.* at 661-62, 224 S.E. 2d at 563.

Defendants' reliance on *Harrelson, Smith* and *Brower* lends little support to their contentions.

As to *Harrelson*, we are of the opinion that the excluded evidence should have been admitted pursuant to the shorthand statement of fact rule. *Smith* and *Brower*, in effect, restate that rule. Further, we conclude that *Brower* not only contains a correct statement of the law, but strongly tends to support the State's position.

In instant case, the witness Owens had engaged in conversations with the other conspirators, including defendants Brown and Martin, concerning a plan to rob the Handy Pantry store. The challenged testimony did not constitute an expression of opinion

by a lay witness. To the extent that Owens testified that defendants went across the street "to wait on us," he was merely reiterating his prior admissible testimony as to what defendants Martin and Brown had told him. Owens' response as to *why* defendants were going to wait was not an expression of opinion as to their intent; rather, it was simply a recitation of the sequence of events as seen and heard by Owens. *State v. Brower*, 289 N.C. 644, 224 S.E. 2d 551. The inference drawn by the witness flowed naturally and logically from the facts and circumstances about which he testified. 1 *Brandis on North Carolina Evidence* § 125 (2d Rev. Ed. 1982).

This assignment of error is overruled.

[4] Defendants assign as error the ruling of the trial judge permitting the State to introduce into evidence a prior written statement made by the witness Owens.

The statement was admitted by the trial judge with instruction that this evidence was offered for the purpose of corroboration, "if you, the jury, you being the triers of the facts, finds that prior statement does in fact corroborate his testimony at this trial and for no other purpose."

Defendants additionally argue that the statement was an attempt by the prosecutor to impeach his own witness.

It has long been recognized in North Carolina that prior consistent statements made by a witness are admissible for corroborative purposes when the witness is impeached in any manner. 1 Brandis on North Carolina Evidence, supra, § 50; *State v. Medley*, 295 N.C. 75, 243 S.E. 2d 374 (1978); *State v. Bennett*, 226 N.C. 82, 36 S.E. 2d 708 (1946). The wide latitude which this jurisdiction grants to the admission of this type of evidence is set forth in recent decisions which state the rule that prior consistent statements are admissible even when the witness has not been impeached. *State v. Perry*, 298 N.C. 502, 259 S.E. 2d 496 (1979); *State v. Best*, 280 N.C. 413, 186 S.E. 2d 1 (1972). Nevertheless, it remains the law in this State that the prior statements of a witness must in fact corroborate the testimony of the witness. If the previous statements are generally consistent with the witness' testimony, slight variations will not render the statements inadmissible, but such variations only affect the credibility of the statement. *State v. Britt*, 291 N.C. 528, 231 S.E. 2d 644 (1977).

It is true that the State may not impeach its own witness by introducing his prior *contradictory* statements under the guise of corroboration. *State v. Brooks*, 260 N.C. 186, 132 S.E. 2d 354 (1963).

We, therefore, are brought to the question of whether the prior statement in instant case was in fact corroborative or whether the prior statement so substantially varied from the witness' in-court testimony that it was contradictory and impeaching. Defendants focus their argument on that portion of the prior written statement which reads: "Sometime in November of 1981, me, Ameen Kareem Abdullah, Richard Washington, John Martin, Charles Brown, and a guy named Wheaty all went on Eastway Drive to do a robbery." Defendants argue that the witness Owens' in-court testimony was to the effect that upon leaving Eastland Mall, the place they first intended to rob, the parties were headed home. There was no mention of robbing the Handy Pantry until the cars pulled along side one another behind the Handy Pantry.

In our opinion, the fact that the in-court testimony tended to show that the conspiracy to rob the Handy Pantry occurred after the parties arrived on Eastway Drive, and the prior written statement tended to show that the plan was formulated before they came to Eastway Drive, does not amount to a substantial variance. *Where* the conspiracy to rob was formulated is of little moment.

We have carefully compared Owens' in-court testimony with his prior written statement and we are of the opinion that the prior statement does corroborate his in-court testimony.

We hold that the trial judge properly admitted the witness Owens' prior written statement into evidence.

[5] Defendant Martin contends that the trial judge erred in overruling his objection and denying his motion to strike the testimony of witness Owens to the effect that he saw two pistols in the possession of Martin and Abdullah on the day following the armed robbery of the Handy Pantry store.

The questioned testimony appears in the record as follows:

Q. Where did you see the two pistols marked as State's Exhibit Number One and State's Exhibit Number Two?

MR. TOMBERLIN: Objection.

COURT: Overruled.

DEFENDANT BROWN'S EXCEPTION NUMBER NINE (9).

A. They were in the possession of Abdullah and John Martin.

MR. KARRO: Objection, move to strike.

COURT: Overruled. Motion to strike denied.

DEFENDANT MARTIN'S EXCEPTION NUMBER TEN (10).

Defendant argues that defendant's answer was a nonresponsive conclusive statement as to who *owned* the weapons. We disagree. Suffice it to say that we are of the opinion that the answer was responsive and cannot reasonably be interpreted as implying who might be the owner of the weapons. In fact, the witness had previously indicated in his testimony that one of the pistols belonged to Abdullah and the other to the deceased police officer. His answer merely related what he had observed.

[6] By his assignment of error No. 7, defendant Brown contends that the trial judge erred by overruling his objection to evidence relative to the sale of the murder weapon and Officer Cannon's pistol on the day after the armed robbery of the Handy Pantry store. He argues that these acts of other conspirators were not made during the course of and in furtherance of the conspiracy to commit the armed robbery, and therefore this testimony was not admissible as to him.

It is true that for many years it has been the general rule in North Carolina that when the State establishes a *prima facie* case of conspiracy, the acts and declarations of each party to the conspiracy in furtherance of its purposes is admissible against other conspirators when made or done after the conspiracy was formed and before it terminated. Declarations or acts made or done prior to the formulation of the conspiracy or after its termination, according to the long-standing rule, were admissible only against the one who committed the acts or made the declarations. *State v. Branch*, 288 N.C. 514, 220 S.E. 2d 495 (1975), *cert. denied*, 433 U.S. 907 (1977); *State v. Conrad*, 275 N.C. 342, 168 S.E. 2d 39 (1969). However, in *State v. Tilley*, 292 N.C. 132, 232 S.E. 2d 433 (1977), we recognized a distinction between *declarations* and *acts*

and clarified the latter rule as it applied to acts not intended as declarations.

In *Tilley*, defendants Tilley, Smith and Jordan were charged with first-degree murder and conspiracy to commit a felonious assault with firearms. Among the challenged evidence was testimony that Smith, one of the co-conspirators, was seen carrying and brandishing a pistol during the day and evening of the murder. Defendants Tilley and Jordan objected to this testimony on the ground that these acts transpired before the conspiracy was formed. Defendants Tilley and Jordan also objected to testimony of the witness Julia Pruitt to the effect that she threw the murder weapon away in a pasture behind her trailer.

In sustaining the trial judge's rulings admitting this evidence, we stated, *inter alia*:

> On the facts of the present case it is appropriate to examine the rules which apply to acts or declarations of a conspirator committed or said outside the pendency of the conspiracy.
>
> It does not necessarily follow that these acts or declarations are always inadmissible. *Acts* done by a co-conspirator before or after the conspiracy, which were not intended as declarations, are not hearsay and thus are competent evidence, assuming their relevance. *Anderson v. United States*, 417 U.S. 211, 41 L.Ed. 2d 20, 94 S.Ct. 2253 (1974); *Lutwak v. United States*, 344 U.S. 604, 97 L.Ed. 593, 73 S.Ct. 481 (1953). Any statements in our cases that may have indicated that acts by co-conspirators outside the pendency of a conspiracy are inadmissible, are not applicable to acts not intended as a means of expression.

*   *   *   *

> Smith's act in carrying a pistol was not intended as a declaration. Hence it matters not whether the prosecution had established a *prima facie* case for the existence of the conspiracy at all times that Smith was seen with the gun. This evidence was within the personal knowledge of the testifying witnesses and was not hearsay. Defendants' exceptions 14-18 are overruled.
>
> Similarly, Julia Pruitt's testimony that she later threw this gun away in the pasture behind her trailer was admissi-

ble. Of her own knowledge, she explained how she gained possession of Smith's pistol, disposed of it and later led law enforcement officers to it. *State v. Bovender*, 233 N.C. 683, 65 S.E. 2d 323 (1951). Her evidence was probative and not hearsay. The fact that she threw the pistol away after termination of the conspiracy and that she did so out of the presence of the defendants is irrelevant. Defendants' exceptions 47-49 and 52-53 are overruled.

*Id.* at 140, 232 S.E. 2d at 439-40.

Here, the questioned evidence involved *acts* obviously not intended as declarations. The evidence was relevant to show guilty knowledge and an attempt to suppress evidence. Under the rule announced in *State v. Tilley*, the challenged evidence was admissible.

We, therefore, hold that the trial judge did not err in permitting evidence of the sale of the murder weapons and Officer Cannon's pistol on the day following the commission of the charged crimes.

**[7]** Defendants Martin and Brown assign as error the denial of their respective motions to dismiss the charges of armed robbery and first-degree murder at the conclusion of the State's evidence.

It is well settled in this jurisdiction that when a conspiracy is formed to commit an armed robbery and any one of the conspirators commits a murder in the perpetration or attempted perpetration of the armed robbery, all conspirators actually or constructively present, aiding and abetting the actual perpetrators of the crime of armed robbery are guilty of murder in the first degree. *State v. Fox*, 277 N.C. 1, 175 S.E. 2d 561 (1970); *State v. Carey*, 285 N.C. 497, 206 S.E. 2d 213 (1974). Where one has entered into the perpetration of a felony and has aided or encouraged its commission, he cannot escape criminal liability by withdrawing from the scene. *State v. Spears*, 268 N.C. 303, 150 S.E. 2d 499 (1966).

A motion to dismiss in a criminal case requires the court to consider the evidence in the light most favorable to the State, take it to be true, and give the State the benefit of every reasonable inference to be drawn therefrom. *State v. Goines*, 273

State v. Martin

N.C. 509, 160 S.E. 2d 469 (1968); *State v. Overman*, 269 N.C. 453, 153 S.E. 2d 44 (1967).

There was evidence in instant case tending to show that after the parties to the conspiracy formed the plan to rob the Handy Pantry store, defendants Brown and Martin agreed to wait across the street in an automobile for the individuals who agreed to commit the actual robbery. There was also evidence that defendants Martin and Brown circled the block in the automobile while the robbery was in progress and fled the scene only after hearing shots and observing police cars coming to the scene. The evidence shows that there was some hesitancy on the part of Brown and Martin about taking part in the robbery, but after it was agreed that others would enter the store, they remained outside the store, either parked or circling the block, while Abdullah, Owens and Randolph entered the store and committed the crimes of armed robbery and first-degree murder. Further, when Brown and Martin fled the scene, they went to Abdullah's apartment. There Martin told Abdullah's wife, "We went to make a lick, and me and Charlie Brown was at some store. We were supposed to be circling." He further stated that upon hearing shots and seeing police cars, they left the scene. When Abdullah later came to his apartment, he told Martin that he should not have left them. Both Martin and Brown shared in the proceeds of the robbery.

We are of the opinion, and so hold, that there was ample evidence, when taken in the light most favorable to the State, for the trial judge to find that defendants Brown and Martin were actually or constructively present at the crime scene with intent to aid in the commission of the crime of armed robbery and that they had communicated their intent to render assistance to the actual perpetrators of the crime.

We find no error in the trial judge's ruling denying the respective motions of Brown and Martin to dismiss the charges of armed robbery and murder.

Finally, defendants Brown and Martin assign as error the trial judge's denial of their respective motions to dismiss the charge of conspiracy at the close of the State's evidence. This assignment of error is based on each defendant's contention that there was no competent evidence of a conspiracy. We have hereinabove considered and answered this contention adversely to de-

fendants' position. Therefore this assignment of error is without merit.

[8] Our careful examination of defendants' assignments of error and the entire record discloses no error requiring that the verdicts returned or the judgments imposed in the cases charging first-degree murder and conspiracy to commit armed robbery against each defendant be disturbed. We note, however, that each defendant was convicted of first-degree murder under the felony murder rule and separate judgments were pronounced upon the verdicts of guilty in the first-degree murder charges, the conspiracy charges, and the armed robbery charges. The commission of the crime of armed robbery was the basis for the conviction of defendant Brown for first-degree murder in case number 82CRS5472; and for the conviction of defendant Martin of first-degree murder in case number 82CRS5470. Therefore no additional punishment may be imposed for the convictions of armed robbery as independent criminal offenses. *State v. Williams*, 284 N.C. 67, 199 S.E. 2d 409 (1973); *State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972). The separate judgment imposing a prison sentence upon defendant Martin on the verdict of guilty of armed robbery in case number 82CRS5469 and the separate judgment imposing a prison sentence upon defendant Brown on the verdict of guilty of armed robbery in case number 82CRS5475 are arrested.

In case number 82CRS5470, charging James Eric Martin, Jr., with first-degree murder—no error.

In case number 82CRS5468, charging James Eric Martin, Jr., with conspiracy to commit armed robbery—no error.

In case number 82CRS5469, charging James Eric Martin, Jr., with armed robbery—judgment arrested.

In case number 82CRS5472, charging Charles Alvin Brown with first-degree murder—no error.

In case number 82CRS5473, charging Charles Alvin Brown with conspiracy to commit armed robbery—no error.

In case number 82CRS5475, charging Charles Alvin Brown with armed robbery—judgment arrested.