STATE OF NORTH CAROLINA v. KERRY JARROD PETTIGREW

No. COA09-1226

(Filed 1 June 2010)

**1. Sexual Offenses— sufficient evidence—bill of particulars**

The trial court did not err in denying defendant's motion to dismiss charges of first-degree sexual offense because there was substantial evidence that the victim was abused within the time period alleged in the bill of particulars.

**2. Jurisdiction— subject matter—defendant able to be tried as an adult**

The trial court had subject matter jurisdiction over a sexual offenses case because defendant was 16 years old during the period of time that the superseding indictment alleged that defendant committed the charged offenses.

**3. Sentencing— not cruel and unusual punishment**

Defendant's sentence of 32 to 40 years in prison for his conviction of two counts of first-degree sexual offense against his half-brother was not cruel and unusual punishment in light of the Supreme Court's decision in *State v. Green*, 348 N.C. 588.

Appeal by Defendant from judgments and commitments entered 26 March 2009 by Judge Lindsay R. Davis, Jr. in Superior Court, Forsyth County. Heard in the Court of Appeals 8 March 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Jane Rankin Thompson, for the State.*

*Michael E. Casterline for Defendant-Appellant.*

STEPHENS, Judge.

On 25 March 2009, a jury found Defendant guilty of two counts of first degree sexual offense and not guilty of taking indecent liberties with a child. On 26 March 2009, the trial court entered judgments corresponding to the jury's verdict and sentenced Defendant to consecutive terms of 192 to 240 months imprisonment.[1] The evidence presented at trial tended to show the following:

---

1. Defendant's sentence equates to a term of 32 to 40 years imprisonment.

**STATE v. PETTIGREW**

[204 N.C. App. 248 (2010)]

Defendant was born on 23 January 1985, and his half brother, K.P.,[2] was born on 21 November 1990. Defendant and K.P. have the same father. When Defendant was nine years old, he began living with his father in Winston-Salem, North Carolina. At that time, K.P. resided permanently with his mother, but he stayed at his father's home two to three times per week, where he and Defendant would share a bedroom.

K.P. testified that when he was five years old and Defendant was 11 years old, Defendant began abusing him. The abuse began one night when Defendant and K.P. had gone to bed, and Defendant exposed his penis to K.P. On another occasion when K.P. was spending the night at his father's, Defendant again exposed his penis and asked K.P. to "masturbate him[,]" by saying, " 'Put your hand around this and do this for me.' " K.P. testified that

[o]ver a period of time, you know, the small instances of me just masturbating him continued in the bedroom or in the living room. It was wherever the two of us happened to be at the moment with no one around. One instance, he—after I had masturbated him for a while, he then asked me to lick his butt.

K.P. stated that he complied with Defendant's request to "lick his butt." K.P. could not recall exactly when this incident occurred, but stated that he may have been older than five years old at that time.

On another occasion, Defendant asked K.P. to perform oral sex on him, and K.P. complied. K.P. described the manner in which each encounter typically transpired as follows:

[Defendant] would ask me to masturbate him and then he would—(pause)—he wouldn't force me to do anything. He would not force me. And he would ask me to masturbate him and then he would be like, "Okay. If you love me, you will go ahead and you will lick my butt," or then as it graduated, he would say, "Okay. Suck my dick."

When K.P. was six years old, Defendant performed anal sex on K.P. On that instance, instead of telling K.P. that "[i]f you love me, you would do this[,]" Defendant "was a little more violent." Defendant told K.P. to take off his clothes, but K.P. did not comply. Thereafter, "[Defendant] took off [K.P.'s] clothes, piece by piece. And after that, [K.P.] performed oral sex on [Defendant]; and then after that, [Defendant] performed anal sex on [K.P.]"

---

2. We use Defendant's half-brother's initials to protect his privacy.

When K.P. was seven years old and Defendant was 12 years old, the brothers' father, stepmother, half sister, and Defendant moved into a new house in Winston-Salem. Before the move, Defendant would appeal to K.P.'s "sense of wanting to be the good little brother[,]" by saying, " 'Come help big brother out.' " After the move, Defendant's abuse of K.P. continued, but Defendant "became more violent[,]" and Defendant "would be forceful." On one occasion, Defendant grabbed K.P.'s arm, threatened to kill K.P. if he told anyone about what was happening, and told K.P. to remove his clothes. Defendant laid on the bed and ordered K.P. to "lick his butt" and perform oral sex on him, and then Defendant performed anal sex on K.P. K.P. testified that this sequence of events occurred approximately 30 to 35 times after Defendant and his father moved into the new house.

K.P. could not recall exactly when the last incident of abuse occurred, but he remembered that it was sometime prior to an altercation in the summer of 2001 between K.P. and Defendant. During that incident, Defendant had taken K.P.'s bicycle out all day without K.P.'s permission. When Defendant came home with K.P.'s bicycle, K.P. was upset and asked where Defendant had been and why Defendant did not ask permission to use the bicycle. This angered Defendant and he told K.P. to "[g]o upstairs." K.P. asked, "Why?" and Defendant responded, "You know for what." K.P. refused to go upstairs

> [a]nd [Defendant] went back into the kitchen and he grabbed a knife and I ran out of the house and got on my bike, which was on the front porch at the time, and rode to one of my friends [sic] from school, his house, who lived up the street. And [Defendant] chased me out the house with the knife and partially down the street until [Defendant] couldn't keep up with me. And from there, when I arrived, I was crying. I was really upset. And when I arrived, they called my parents. . . . They called my parents and one of my parents called the police and the police came.

K.P. did not tell the police or his parents about the sexual abuse at that time. Defendant's abuse of K.P. had been ongoing up until this point, but the abuse did not occur again after this incident.

In April 2007, K.P. learned that Defendant planned to marry his girlfriend, who had three young children. At that time, K.P. told his parents that Defendant had "molested" him over the course of five years. K.P. decided to tell his parents at that time because he "was

STATE v. PETTIGREW

[204 N.C. App. 248 (2010)]

just concerned because [he] didn't want [the abuse] to happen to any-one else." K.P. waited until September 2007 to tell the police about the abuse because he "was afraid for [his] safety."

K.P.'s father testified that in April 2007, K.P. told him that Defendant had "continuously molested" K.P. from the time K.P. was five until K.P. was 11 or 12 years old. Defendant's father con-fronted Defendant about K.P.'s allegations about a week later, and Defendant "denied it vehemently[.]" Defendant's father also testi-fied that he recalled the incident where law enforcement officials were called due to reports that Defendant had chased K.P. down the street with a knife.

Detective T.G. Porter ("Detective Porter") of the Winston-Salem Police Department spoke with K.P. and his father on 11 September 2007. K.P. told Detective Porter that Defendant had sexually abused him from the time K.P. was five years old until he was 13 years old. Detective Porter referred the case to the criminal investigations division.

Detective Kelly Wilkinson ("Detective Wilkinson") of the Winston-Salem Police Department's criminal investigations division testified that she interviewed K.P. on 13 September 2007. K.P. told Detective Wilkinson essentially the same story to which he testified at trial. K.P. told Detective Wilkinson that Defendant's sexual abuse stopped when K.P. was in the seventh grade. Detective Wilkinson also spoke to Defendant, and Defendant denied sexually abusing K.P. Detective Wilkinson confirmed that the altercation between De-fendant and K.P. involving the knife occurred on 6 August 2001.

At the close of the State's evidence, Defendant made a motion to dismiss because the evidence was insufficient to show that the abuse occurred during the time frame stated in the bill of particulars, 1 February 2001 through 20 November 2001. Defendant's motion was denied. Defendant did not present any evidence. Defendant renewed his motion to dismiss, and this motion was denied. The jury found Defendant guilty of two counts of first degree sexual offense and not guilty of taking indecent liberties with a child. Defendant appeals.

*Discussion*

*A. Sufficiency of the Evidence*

[1] In his first argument, Defendant argues that there' was insuffi-cient evidence to support his conviction because there is no evidence

that the abuse occurred during the time frame alleged in the bill of particulars. We disagree.

On appeal of a trial court's denial of a motion to dismiss for insufficient evidence, this Court considers "whether substantial evidence exists as to each essential element of the offense charged and of the defendant being the perpetrator of that offense." *State v. Glover*, 156 N.C. App. 139, 142, 575 S.E.2d 835, 837 (2003) (citing *State v. Barden*, 356 N.C. 316, 351, 572 S.E.2d 108, 131 (2002), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003)). " 'The existence of substantial evidence is a question of law for the trial court, which must determine whether there is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *Barden*, 356 N.C. at 351, 572 S.E.2d at 131). In determining the existence of substantial evidence, "[t]he court must 'consider the evidence in the light most favorable to the State, take it to be true, and give the State the benefit of every reasonable inference to be drawn therefrom.' " *Id.* (quoting *State v. Martin*, 309 N.C. 465, 480, 308 S.E.2d 277, 286 (1983)).

The superseding indictment in this matter was filed on 10 March 2008 and states that the alleged offenses occurred on or about 1 February 2001 through 20 November 2001. Pursuant to N.C. Gen. Stat. § 15A-924(a)(4), "an indictment must allege the date or the period of time during which the offense was committed." *State v. Burton*, 114 N.C. App. 610, 612, 442 S.E.2d 384, 385 (1994). Section 15A-924(a)(4) provides that

> [a] criminal pleading must contain . . . [a] statement or cross reference in each count indicating that the offense charged was committed on, or on or about, a designated date, or during a designated period of time. Error as to a date or its omission is not ground for dismissal of the charges or for reversal of a conviction if time was not of the essence with respect to the charge and the error or omission did not mislead the defendant to his prejudice.

N.C. Gen. Stat. § 15A-924(a)(4) (2008).

On 30 January 2009, defense counsel filed a motion for a bill of particulars. *See* N.C. Gen. Stat. § 15A-925(a) (2009) ("Upon motion of a defendant under G.S. 15A-952, the court in which a charge is pending may order the State to file a bill of particulars with the court and to serve a copy upon the defendant."). On 11 March 2009, the State filed a bill of particulars, which stated in part that

this case involves a teenage child of age 18 (eighteen) years of age and the victim shall be testifying about a ten year time span; therefore, times, dates, and locations cannot be as exact as when dealing with adult victims. Moreover, the State has provided the defendant with open discovery regarding the above-cited cases. However, in view of the foregoing, the State, being as specific as possible, makes the following answer:

1. The date of the alleged offenses occurred on or about February 1, 2001 through November 20, 2001.

Pursuant to section 15A-925(e), "[t]he evidence of the State, as to those matters within the scope of the motion, is limited to the items set out in the bill of particulars." N.C. Gen. Stat. § 15A-925(e) (2009).

"However, it is well established that variance between allegation and proof as to time is not material where no statute of limitations is involved." *Burton*, 114 N.C. App. at 612, 442 S.E.2d at 385 (internal citations and quotation marks omitted). " '[T]he date given in the bill of indictment is not an essential element of the crime charged and the fact that the crime was in fact committed on some other date is not fatal.' " *Id.* (quoting *State v. Norris*, 101 N.C. App. 144, 151, 398 S.E.2d 652, 656 (1990), *disc. review denied*, 328 N.C. 335, 402 S.E.2d 843 (1991)).

In cases involving allegations of child sex abuse, temporal specificity requirements are further diminished. *State v. Everett*, 328 N.C. 72, 75, 399 S.E.2d 305, 306 (1991). Children frequently cannot recall exact times and dates; accordingly, a child's uncertainty as to the time of the offense goes only to the weight to be given that child's testimony. *Id.* Judicial tolerance of variance between the dates alleged and the dates proved has particular applicability where, as in the case *sub judice*, the allegations concern instances of child sex abuse occurring *years before. See State v. Norris*, 101 N.C. App. at 150-51, 398 S.E.2d at 656. Unless a defendant demonstrates that he was deprived of the opportunity to present an adequate defense due to the temporal variance, the policy of leniency governs. *State v. Young*, 103 N.C. App. 415, 420, 406 S.E.2d 3, 6, *disc. review denied*, 330 N.C. 201, 412 S.E.2d 65 (1991); [*State v. Riggs*, 100 N.C. App. 149, 152, 394 S.E.2d 670, 672 (1990)]; *see also* G.S. § 15A-924(a)(4) ("Error as to a date or its omission is not ground for dismissal of the charges or for reversal of a conviction if time was not of the essence with

respect to the charge and the error or omission did not mislead the defendant to his prejudice.").

*Burton*, 114 N.C. App. at 613, 442 S.E.2d at 386.

In *Burton*, where the defendant was convicted of taking indecent liberties with a child and incest, *inter alia*, our Court held that no fatal variance existed between the time periods stated in the four challenged indictments and the evidence presented at trial. *Id.* at 614, 442 S.E.2d at 386. For example, two of the indictments in *Burton* alleged that the defendant committed incest in September 1976 and March 1977. *Id.* at 613, 442 S.E.2d at 386. The victim testified that only one instance of sexual intercourse occurred when she was 13 years old, which was at least one month before September 1976 and at least seven months before March 1977. *Id.* The victim testified that she and the defendant engaged in sexual intercourse " 'two or three times a week' from age thirteen until her high school years." *Id.* Based on this evidence "and in light of the policy of leniency applicable to temporal discrepancies in child sex abuse indictments," we held that no fatal variance existed as to the challenged offenses. *Id.* at 614, 442 S.E.2d at 386. We further noted that the defendant "suffered no prejudice as his defense was based upon denial of the charges rather than alibi during the time frames set out in the indictments." *Id.*

In the present case, the evidence tended to show that Defendant sexually abused K.P. from the time K.P. was five years old until he was ten years old. K.P. was born on 21 November 1990, and thus, was ten years old during the entire time period set out in the superseding indictment and bill of particulars. K.P. testified that his father moved to a new house when he was seven years old and that Defendant abused him the majority of the times K.P. visited his father at the new house. Defendant engaged in oral and anal sex with K.P. when K.P. was "eight, nine, 10" years old. Although K.P. could not recall the exact date of the last time he had sexual contact with Defendant, K.P. said that he "would have been 10 at the time" and testified that the abuse had been ongoing up until the incident in August 2001 involving the bicycle and a knife.

During direct examination of K.P., the State asked K.P. how old he was when Defendant stopped abusing him. K.P. answered, "I would have been 10." During his testimony, K.P. asserted three times that he was ten years old when the abuse finally stopped. When asked how he remembered how old he was when the abuse finally stopped, K.P. testified that

[t]here was an altercation between my brother and I one summer at the Williamsburg address concerning the fact that he had taken my bike out all day and my father was out of the house. He had taken my bike out all day and I was at home. And he came home with my bike. I was upset because it was my property. And when he came in, I asked him where he had been because everybody was, you know, wondering where he was, and I asked him why he didn't ask my permission to take my bike and he got angry. And he went into the kitchen to do something—I think it was to make a sandwich, and came back out and he was like, you know, "Go upstairs."

And I was like, "Why?"

And he's like, "You know for what."

And I was like, "No."

. . . .

[THE STATE:] So nothing happened as far as the sex on that day?

[K.P.:] Right.

[THE STATE:] That was the day you finally said no?

[K.P.:] Yes.

K.P. also testified that Defendant was 16 years old at the time of the last incident.

[THE STATE:] So how old were you prior to the last incident where you told him, no, you weren't going to do? How old were you at that time?

[DEFENSE COUNSEL:] Objection. Asked and answered.

[THE COURT:] Well, I think he's already testified how old he was at the last incident.

[THE STATE:] How old was Kerry?

[K.P.:] Kerry would have been—(pause)—Kerry would have been 16.

[THE STATE:] All right. So the incident you just talked about with the—in the living room with the oral and the anal sex, how old were you at the Williamsburg address when that would occur?

[K.P.:] Eight, nine, 10. It would be random.

K.P.'s testimony regarding what he told Detective Wilkinson provides further support for the inference that Defendant's abuse was ongoing up until the incident with the knife in the summer of 2001. When asked what he told Detective Wilkinson, K.P. replied, "I told the detective much of what I spoke of today. About the instances of the sexual abuse and when it finally came to an end, the situation with the knife." On cross-examination, defense counsel asked K.P., "And you were very clear today that that instance about the bike is when [the abuse] all ended, right?" K.P. answered, "Yes." Accordingly, there was substantial evidence that Defendant abused K.P. up until August 2001, which was well within the time period alleged in the bill of particulars.

We note that unlike in *Burton* where the time frames alleged in the indictments were inconsequential, the time frame in which the abuse occurred in the present case is important. Defendant was born on 23 January 1985. The superseding indictment and bill of particulars allege that Defendant committed the charged offenses between 1 February 2001 and 20 November 2001, when he was sixteen years old, which would allow the State to prosecute Defendant as an adult. *See* N.C. Gen. Stat. § 7B-1604(a) (2009) ("Any juvenile . . . who commits a criminal offense on or after the juvenile's sixteenth birthday is subject to prosecution as an adult."). Nevertheless, unless Defendant "demonstrates that he was deprived of the opportunity to present an adequate defense due to the temporal variance, the policy of leniency [in cases involving child sexual abuse] governs." *Burton*, 114 N.C. App. at 613, 442 S.E.2d at 386. Here, Defendant argues only that the evidence was insufficient to show that Defendant engaged in sexual acts with K.P. during the time period specified in the bill of particulars. Viewed in the light most favorable to the State, however, K.P.'s testimony sufficiently establishes that Defendant continued to abuse K.P. during the time period charged.

Accordingly, based on the foregoing evidence "and in light of the policy of leniency applicable to temporal discrepancies in child sex abuse indictments," *id.* at 614, 442 S.E.2d at 386, we hold there was substantial evidence that Defendant abused K.P. within the alleged time period and the trial court thus properly denied Defendant's motion to dismiss. Defendant's argument and the assignments of error upon which it is based are overruled.

### B. *Superior Court's Jurisdiction*

[2] Defendant next argues that his convictions must be vacated because the time period of the offenses alleged in the superseding

STATE v. PETTIGREW

[204 N.C. App. 248 (2010)]

indictment encompasses a time prior to Defendant's 16th birthday, and thus, the superior court lacked jurisdiction over this matter.[3] We disagree.

"[W]hether a trial court has subject matter jurisdiction is a question of law, which is reviewable on appeal de novo." *State v. Black*, —— N.C. App. ——, ——, 677 S.E.2d 199, 202 (2009) (internal citation and quotation marks omitted). "Subject matter jurisdiction cannot be conferred upon a court by consent, waiver or estoppel, and failure to demur or object to the jurisdiction is immaterial." *Stark v. Ratashara*, 177 N.C. App. 449, 451-52, 628 S.E.2d 471, 473 (2006).

The district court "has exclusive, original jurisdiction over any case involving a juvenile who is alleged to be delinquent. For purposes of determining jurisdiction, the age of the juvenile at the time of the alleged offense governs." N.C. Gen. Stat. § 7B-1601(a) (2009). If, however, a juvenile commits a criminal offense on or after the juvenile's 16th birthday, the juvenile is subject to prosecution as an adult in superior court. *See* N.C. Gen. Stat. § 7B-1604 (2009).

As stated *supra*, the superseding indictment alleged that Defendant committed the charged offenses "on or about" 1 February 2001 through 20 November 2001. On 23 January 2001, Defendant turned 16 years old. Thus, Defendant contends that the "on or about" language in the superseding indictment could encompass acts committed before 23 January 2001, when Defendant was 15 years old.

N.C. Gen. Stat. § 15A-924(a)(4) provides that an indictment must include "[a] statement or cross reference in each count indicating that the offense charged was committed on, or on or about, a designated date, or during a designated period of time." The "on or about" language is commonly used in indictments, and Defendant acknowledges that this language is usually sufficient for purposes of N.C. Gen. Stat. § 15A-924(a)(4).

We are not persuaded by Defendant's argument. As we held above, there was substantial evidence that Defendant committed the charged offenses *within* the time frame alleged in the superseding indictment. Defendant was 16 years old during that entire time frame.

---

3. Defendant failed to assign this argument as error in the record on appeal. On 7 December 2009, Defendant made a motion to this Court to allow amendment of the record on appeal to include this additional assignment of error. Our Court allowed Defendant's motion on 22 December 2009, and thus, Defendant's argument is properly before us for review.

Accordingly, Defendant's argument is without merit, and this assignment of error is overruled.

### C.  Cruel and Unusual Punishment

**[3]**  In his final argument, Defendant contends that his sentence of 32 to 40 years imprisonment violates the United States and North Carolina constitutional prohibitions against cruel and unusual punishment because of his young age when he committed the offenses. The State argues that Defendant has not preserved this issue for appellate review because Defendant did not raise this constitutional issue at trial. *See State v. Garcia,* 358 N.C. 382, 410, 597 S.E.2d 724, 745 (2004) ("[C]onstitutional matters that are not raised and passed upon at trial will not be reviewed for the first time on appeal." (Internal citations and quotation marks omitted)). However, in *State v. Curmon,* 171 N.C. App. 697, 615 S.E.2d 417 (2005), our Court held that "[a]n error at sentencing is not considered an error at trial for the purpose of Rule 10(b)(1) because this rule is directed to matters which occur at trial and upon which the trial court must be given an opportunity to rule in order to preserve the question for appeal." *Id.* at 703, 615 S.E.2d at 422 (internal citation and quotation marks omitted). Accordingly, Defendant was not required to object at sentencing to preserve this issue on appeal. *Id.* at 704, 615 S.E.2d at 422-23.

The Eighth Amendment to the United States Constitution states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Similarly, Article I, Section 27 of the North Carolina Constitution prohibits the infliction of "cruel *or* unusual punishments." N.C. Const. art. I, § 27 (emphasis added). Historically, our courts have "analyzed cruel and/or unusual punishment claims by criminal defendants the same under both the federal and state Constitutions." *State v. Green,* 348 N.C. 588, 603, 502 S.E.2d 819, 828 (1998).

In *Green,* the defendant argued "that committing a thirteen-year-old defendant to a term of life imprisonment for first-degree sexual offense constitute[d] cruel and unusual punishment for purposes of the Eighth and Fourteenth Amendments to the United States Constitution as well as Article I, Section 27 of the North Carolina Constitution." *Id.* at 602, 502 S.E.2d at 827-28. Our Supreme Court disagreed and upheld the defendant's sentence, holding that "sentencing a thirteen-year-old defendant to mandatory life imprisonment for commission of a first-degree sexual offense is within the bounds of

society's current and evolving standards of decency." *Id.* at 608, 502 S.E.2d at 831.

Here, Defendant acknowledges our Supreme Court's holding in *Green* but urges this Court to reconsider this issue in light of the United States Supreme Court's holding in *Roper v. Simmons*, 543 U.S. 551, 161 L. Ed. 2d 1 (2005). In *Roper*, the Court held that the characteristics of juvenile offenders such as their diminished culpability and their capacity for change rendered the death penalty unconstitutional as applied to offenders who committed their offenses before the age of 18 years old, even though the death penalty is otherwise constitutional when applied to adult offenders. *Id.* at 573-74, 161 L. Ed. 2d at 24-25. Contrary to Defendant's contention, the decision in *Roper* does not distinguish our Supreme Court's holding in *Green*. In *Roper*, the Court considered only the imposition of the death penalty for juvenile offenders and did not consider either life imprisonment or any other term of imprisonment of juveniles.

In the present case, Defendant was 16 years old when he committed the sexual offenses for which he was sentenced to 32 to 40 years imprisonment. In light of the decision in *Green*, in which a term of life imprisonment for a 13-year-old sexual offender was held not to be "grossly disproportionate" and not in violation of the constitutional prohibitions against cruel and unusual punishments, we uphold Defendant's sentence. *Green*, 348 N.C. at 609, 502 S.E.2d at 832.

NO ERROR.

Chief Judge MARTIN and Judge WYNN concur.