IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-136

No. 29PA22

Filed 16 December 2022

STATE OF NORTH CAROLINA

v.

EFREN ERNESTO CABALLERO

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, 281 N.C. App. 215, 2021-NCCOA-718, finding no error after appeal from a judgment entered on 23 January 2020 by Judge Michael O'Foghludha in Superior Court, Durham County. Heard in the Supreme Court on 20 September 2022.

*Joshua H. Stein, Attorney General, by Ryan Y. Park, Solicitor General, for the State-appellee.*

*James R. Glover for defendant-appellant.*

ERVIN, Justice.

¶ 1     The issue before the Court in this case is whether the trial court's failure to preclude the admission of testimony describing certain information provided by the State's principal witness as "rock solid" constituted plain error. On appeal, the Court of Appeals held that the trial court did not commit plain error by allowing the admission of the challenged testimony. After careful consideration of defendant's

challenge to the trial court's judgment in light of the applicable law, we modify and affirm the Court of Appeals' decision.

## I.  Background

### A. Substantive Facts

#### 1. *State's Evidence*

Beginning in 2016, Liliana Pichardo; her husband Jose Luis Yanez Guerrero; and their fifteen-month-old son lived at 3409 Glenn Road in Durham.  Defendant Efren Ernesto Caballero lived next door at 3411 Glenn Road.  Defendant's stepfather, Jorge Huerta, was the pastor of a nearby church that Ms. Pichardo and Mr. Guerrero frequently attended, with Mr. Huerta having assisted Ms. Pichardo and Mr. Guerrero by providing them with a place to live and helping them find work.

Ms. Pichardo claimed to have seen defendant almost every day for two years. After the three of them became acquainted, defendant used a demeaning term in talking with Ms. Pichardo and Mr. Guerrero, demanded that Mr. Guerrero drive him places at night, and insisted that Ms. Pichardo and Mr. Guerrero provide him with food, particularly eggs.  As a result of this behavior, Ms. Pichardo claimed that she was "afraid" to reject defendant's requests.

About two weeks prior to the date upon which Mr. Guerrero died, someone broke into the residence occupied by Ms. Pichardo, Mr. Guerrero, and their son while the family was attending church.  Upon returning home, Ms. Pichardo and Mr.

Guerrero noticed that the door facing defendant's house had been propped open, that the lock to that door had been damaged, and that a trail of footprints led from defendant's residence to their home and back, with a carton of eggs and a loaf of bread being missing from their residence. After Mr. Guerrero had a confidential conversation with Mr. Huerta about the break-in, Mr. Huerta told defendant and his other neighbors about it so that they could take appropriate precautions. Ms. Pichardo stated that defendant's attitude became "more aggressive" after the break-in, with defendant having begun to watch her family, a development that Ms. Pichardo found to be frightening.

At approximately 8:45 p.m. on 13 February 2016, Ms. Pichardo, Mr. Guerrero, and their infant son were in their residence when Ms. Pichardo and Mr. Guerrero heard a "loud noise" outside. Upon looking through the window blinds, Mr. Guerrero observed that defendant was knocking on the door. After defendant repeatedly "insisted" that Mr. Guerrero come outside to assist defendant with his car, Mr. Guerrero agreed to provide the needed help. Although Ms. Pichardo proposed that she should accompany him, Mr. Guerrero told Ms. Pichardo to stay inside with their baby because it was "too cold." At the time that Ms. Pichardo observed defendant at the door to the family residence, he was wearing a black sweatshirt.

After her husband went outside with defendant, Ms. Pichardo heard Mr. Guerrero shouting for help "in a painful way." Upon going outside herself, Ms.

Pichardo "saw [defendant] on top of [Mr. Guerrero]" making a repeated motion with his arm in the direction of Mr. Guerrero's body. At that point, Ms. Pichardo ran over to the two men and shoved defendant off Mr. Guerrero. As she did so, Ms. Pichardo could see defendant's face and noticed that defendant was wearing "[a] black sweatshirt and some light-colored pants."

¶ 7    As soon as Ms. Pichardo began attempting to assist her husband, defendant made the same arm motion that he had been making toward Mr. Guerrero in her direction, a development that caused Ms. Pichardo to reenter her home and grab her child. Although defendant kicked the outermost door to the house and managed, at one point, to put his foot inside the structure, Ms. Pichardo was able to lock the inner door to the residence. After Ms. Pichardo locked the inner door, defendant hit the glass portion of that door and struck Ms. Pichardo's face, causing her to sustain bruising and inflicting lacerations and scratches to both Ms. Pichardo and her child as the result of flying glass.

¶ 8    At that point, Ms. Pichardo fled to a different portion of the house and phoned Mr. Huerta for the purpose of telling him that she and her husband were being attacked by defendant. After Mr. Huerta told Ms. Pichardo how to seek emergency assistance, Ms. Pichardo contacted the emergency services dispatcher and reported that she and her husband were being attacked by their neighbor. More specifically,

Ms. Pichardo told the dispatcher that her neighbor's name was Ernesto Caballero and that he was a twenty-two-year-old Hispanic who was wearing a black sweatshirt.

¶ 9       After Ms. Pichardo spoke with the dispatcher, defendant made a call for emergency assistance as well. In the course of his conversation with the dispatcher, defendant stated that he had heard screaming emanating from his neighbors' property, said that he had become concerned that his neighbors might be in trouble, and claimed to have seen two men running from the residence occupied by Ms. Pichardo, Mr. Guerrero, and their son. According to defendant, he had been inside his own residence when he heard the noises in question.

¶ 10      Deputies Amanda Andrews and Bobby Bradford of the Durham County Sheriff's Office were the first law enforcement officers to reach the Glenn Road area. After their arrival, the officers approached defendant's residence and spoke with him. According to Deputy Andrews, defendant "was wearing a blue and white . . . horizontal striped hoodie," jeans, and leather dress shoes, with both his shoes and his jeans being visibly muddy. In addition, Deputy Bradford testified that there was "fresh" "dirt on [defendant's] pants." In response to the officers' request that he provide an explanation for the condition of his pants and shoes, defendant responded by stating that he had been at work and that these items of apparel had been in their

present condition all day.[1]  Defendant told Deputies Andrews and Bradford that he had heard screaming from his neighbors' house and that he had seen two Black males wearing black clothing running from the scene.

¶ 11      Subsequently, Reserve Deputy John Teer of the Durham County Sheriff's Office arrived at the scene and saw Deputies Andrews and Bradford speaking with defendant.  As the other officers spoke with defendant, Deputy Teer approached the residence occupied by Ms. Pichardo, Mr. Guerrero, and their son to see if anyone had been injured.  As he approached the structure, Ms. Pichardo, who was holding the couple's son, came to the door.  At that time, Deputy Teer observed that there was blood on Ms. Pichardo's face, that Ms. Pichardo appeared to be "terrified and upset," that there was "glass all around the doorstep," and that "a window had been broken out" of the door.

¶ 12      In view of the fact that Ms. Pichardo did not speak anything other than Spanish, Deputy Teer and the other officers could not communicate with her.  After the officers had made contact with an interpreter service, Ms. Pichardo stated that "the neighbor attacked her and then that her husband was in the backyard."  Once Ms. Pichardo had made these statements, other officers brought defendant to the

---

[1] One of defendant's friends, Carlos Cruz, testified that defendant did not work that day; that he and defendant had spent the day drinking alcohol and smoking marijuana; and that defendant's clothes had not been muddy prior to his departure from defendant's residence at approximately 7:00 p.m.

residence occupied by Ms. Pichardo, Mr. Guerrero, and their son so that he could help them by translating what Ms. Pichardo was saying. According to Deputy Andrews, Ms. Pichardo immediately "became very frightened" as soon as she saw defendant, "frantically point[ed] . . . directly at [defendant]," and identified defendant as "the one" who attacked her and her husband. Similarly, Deputy Teer indicated that Ms. Pichardo "began excitedly exclaiming . . . 'He's the one that did it, it's him,' and pointing directly at [defendant]" as soon as she saw him.

¶ 13    At this point, defendant was placed in handcuffs and detained in the carport of the residence occupied by Ms. Pichardo, Mr. Guerrero, and their son. After defendant's sister arrived and saw her brother in handcuffs, she approached defendant without paying any heed to the officers who were trying to get her to refrain from attempting to get near her brother and asked, "What did you do? What did you do?" The blue jeans, tee-shirt, and shoes that defendant had been wearing at the time that he was admitted into the Durham County detention facility tested positive for the presence of blood, with a subsequent DNA analysis performed upon defendant's jeans indicating the presence of Mr. Guerrero's DNA.

¶ 14    After determining that further conversations with defendant would be pointless, Deputy Teer returned to the residence occupied by Ms. Pichardo, Mr. Guerrero, and their son for the purpose of having a further conversation with Ms. Pichardo. During that conversation, which was conducted with the assistance of the

interpreter service, Ms. Pichardo stated that defendant had come to her door and asked for Mr. Guerrero's assistance in starting his automobile, that she had heard Mr. Guerrero screaming shortly thereafter, that she had seen defendant assaulting Mr. Guerrero in the back yard of the residence, and that defendant had punched her through the window while attempting to make a forcible entry into the residence. As she talked with Deputy Teer, Ms. Pichardo identified defendant as her assailant multiple times and in multiple ways and stated that defendant had been wearing a dark hoodie during the attack. After Deputy Teer said that defendant had been wearing a white striped sweatshirt at the time of Deputy Teer's arrival, Ms. Pichardo "immediately said [without hesitation that defendant had] changed his clothes, or he changed out of it." When Deputy Teer asked Ms. Pichardo if she had seen a weapon and suggested that defendant might have had a knife that she could barely see, Ms. Pichardo persisted in saying that she had never seen a weapon.

¶ 15        Investigating officers found Mr. Guerrero's body lying face down in the grass on the side of the residence that was closest to defendant's home. At that time, the officers noted that Mr. Guerrero's clothing was "soaked" in blood, that blood was coming from Mr. Guerrero's mouth, and that there was blood on the leaves around Mr. Guerrero's body. An autopsy performed upon Mr. Guerrero's body established that Mr. Guerrero had suffered twenty stab wounds and six incised wounds; that a sharp object had penetrated Mr. Guerrero's carotid artery and his lungs, liver, and

diaphragm; that the wounds that Mr. Guerrero had sustained would have caused him to lose consciousness and the ability to breathe; that Mr. Guerrero would have ultimately bled to death; and that Mr. Guerrero had died as the result of "multiple strike force injuries."

After having been arrested and placed in jail, defendant placed a call to his mother, resulting in a lengthy discussion between the two of them concerning the cleaning of defendant's clothes. According to defendant's mother, the whole house had been cleaned, the trash had been removed, and she had "got[ten] everything . . . out that was no good." After defendant made inquiry about his clothes and requested that his mother get his clothes and everything else that he had in "[his] other room" and put them in a black bag, defendant's mother responded by stating that she had "brought all [his] dirty clothes" and had "already washed them." At the conclusion of this conversation, defendant reassured his mother that "everything is going to turn out fine."

### 2. *Defendant's Evidence*

3409 Glenn Road was one of five houses located on Glenn Road that were owned by a woman who used to live in another one of the houses, which was located at 3417 Glenn Road. Mr. Huerta, who was the pastor of a church and maintained and collected the rents associated with all five houses, and his wife lived in the second residence, which was located at 3415 Glenn Road. Melissa Caballero Martinez,

defendant's older sister and Mr. Huerta's stepdaughter, lived in the third house, which was located at 3413 Glenn Road. Defendant lived in the fourth house, which was located at 3411 Glenn Road, along with a previously homeless man named Jonathan Martinez, who had been staying with defendant for about four weeks as of the date of Mr. Guerrero's death.

¶ 18 At approximately 9:00 p.m. on 13 February 2016, Mr. Huerta received a call from Ms. Pichardo, who was yelling and who could not be understood to be saying anything other than that something had happened to Mr. Guerrero. Mr. Huerta informed Ms. Pichardo that he and his wife were out of town and advised Ms. Pichardo to call for emergency assistance. After Mr. Pichardo hung up for the purpose of making the recommended call, Mr. Huerta and his wife immediately drove back to Durham. At the time that Mr. Huerta and his wife arrived at Ms. Pichardo's house, they observed that law enforcement officers and vehicles were present.

¶ 19 Ms. Martinez received a call from her mother at about the time that she finished work for the day, with her mother having informed her that something had occurred at the residence occupied by Ms. Pichardo, Mr. Guerrero, and their son and requested that Ms. Martinez check on Ms. Pichardo. Ms. Martinez arrived at the residence occupied by Ms. Pichardo, Mr. Guerrero, and their son between 9:45 p.m. and 10:15 p.m., at which point she observed that a number of law enforcement officers were present.

¶ 20        Defendant indicated that he did not go to work on 13 February 2022. Instead, defendant was visited by two friends and ate breakfast with them at approximately 11:00 a.m., with defendant having worn a black dress shirt that did not have a hood and the jeans and brown dress shoes that he ordinarily wore to work at that time. As a result of the fact that his shirt got dirty while he was eating, defendant replaced the black dress shirt with a black and white striped sweater and wore this attire for the remainder of the day.

¶ 21        Between approximately 7:00 p.m. and 8:00 p.m., defendant and his friends went to pick up another friend and his girlfriend because "they had a joint" to smoke. After stopping by a convenience store to purchase snacks and a couple of beers, the group returned to defendant's residence, where they smoked marijuana and drank beer. At the time that one of defendant's friends said that it was time for him to leave, the entire group left defendant's residence except for defendant and his housemate, Mr. Martinez.

¶ 22        At approximately 8:00 p.m., a friend of Mr. Martinez's named Nino and two other people that defendant had never met before arrived at defendant's residence. Although defendant claimed that he had previously told Mr. Martinez that he did not want Mr. Martinez using cocaine in his house, Nino and the other two men entered defendant's residence over defendant's objection and began using cocaine along with Mr. Martinez despite the fact that defendant declined to join in their drug use.

¶ 23        At some point defendant told Mr. Martinez that Nino and the two men had to leave, an instruction that Mr. Martinez conveyed to the other people who were there. After Nino and the two men left defendant's residence at approximately 8:30 p.m., defendant entered his carport for the purpose of smoking a cigarette and heard someone screaming for help.

¶ 24        Upon hearing these screams, defendant ran behind his house, where he observed two men punching someone lying on the ground in his neighbor's back yard. In light of the fact that it was very dark, defendant could not tell if the assailants had a weapon or if the person being assaulted was male or female. As defendant watched, one of the assailants got up and ran, having been followed by the other assailant a few seconds later. According to information that defendant provided to investigating officers, both assailants entered the woods leading toward East Club Boulevard.

¶ 25        After the two men fled, defendant approached the person on the ground, whom he recognized at that point to be Mr. Guerrero, and knelt down beside him. Although defendant did not see any blood or other sign of a visible injury on Mr. Guerrero's person, Mr. Guerrero was shaking and trying to catch his breath. When defendant asked Mr. Guerrero how he was feeling, Mr. Guerrero was unable to answer. After Mr. Guerrero failed to respond, defendant returned to his house in order to call for emergency assistance.

¶ 26        As a result of the fact that he had lost his cell phone several days earlier, defendant had to use Mr. Martinez's phone to make the call. After Mr. Martinez activated his phone, defendant contacted emergency services personnel. As he spoke with the dispatcher, defendant called out to Ms. Pichardo for the purpose of letting her know that law enforcement officers were on their way.

¶ 27        The first officer to reach the scene arrived while defendant was still speaking with the dispatcher. At the time that the officer arrived, defendant suggested that the officer should go to the residence occupied by Ms. Pichardo, Mr. Guerrero, and their son for the purpose of checking on Mr. Guerrero.

¶ 28        After the officer had done as defendant suggested, other officers told defendant that they needed him to come to the residence occupied by Ms. Pichardo, Mr. Guerrero, and their son to serve as a translator. At the time that defendant arrived at her residence, Ms. Pichardo pointed to defendant and claimed that he had perpetrated the assault upon Mr. Guerrero, her child, and herself. As a result, defendant was placed in handcuffs.

¶ 29        After parking her vehicle in the driveway of the residence occupied by Ms. Pichardo, Mr. Guerrero, and their son and approaching the residence, Ms. Martinez saw defendant, who had been placed in handcuffs. After Ms. Martinez asked her brother what he had done, defendant responded that he had not done anything and that he had, in fact, been the person who had called for emergency assistance.

However, Ms. Pichardo told Ms. Martinez that defendant "did it" and "that it was him."

## B. Procedural History

¶ 30        On 22 February 2016, the Durham County grand jury returned bills of indictment charging defendant with murder, attempted murder, first-degree burglary, assault on a female, and assault on a child under the age of twelve. The charges against defendant came on for trial before the trial court and a jury at the 13 January 2020 criminal session of Superior Court, Durham County, at which point the State elected not to proceed on the assault on a female and assault upon a child under the age of twelve charges. At defendant's trial, Deputy Teer testified on direct examination, without objection, that:

> Q.      So why did -- so why did that stick in your head? Why did you push her on that?
>
> A.      I pushed her on that because frequently, based on my training and experience, I know that if you're talking to a witness and they will change [their] story as you suggest things. I mean, it reduces their credibility if you say, well, this -- how about this; and they go with that. Oh yeah, it could have been that, yeah, I think he was wearing that. That's a red flag right there for the credibility of that person.
>
> But this stuck out because she stuck to her story. She was resolute and rock solid, never wavered, never changed what she was saying. She knew who her attacker was. She knew what he was wearing. And when I tried to say, hey, it couldn't be that, he's not wearing what you just

> told me, she said, well, obvious, he changed. He changed
> his clothing.
>
> The same thing, I also pressed her did you see a
> weapon; did you see a gun; did you see a knife; was he
> maybe holding it and you can barely see it. I was trying to
> give her an opportunity to say, yeah, yeah, I think I saw a
> knife, I think I saw a gun. She didn't. She said she never
> saw a weapon. At one point she said, well, his hand was in
> his pocket, but there -- she did not say that she saw a gun
> or a knife when I was talking with her.
>
> Despite multiple attempts to give her the
> opportunity to expand her story, she didn't. Her story
> stayed entirely 100 percent consistent, resolute and solid.

On 23 January 2020, the jury returned verdicts convicting defendant of first-degree murder on the basis of both malice, premeditation, and deliberation and on the basis of the felony murder rule using the commission of a felonious assault upon Ms. Pichardo as the predicate felony; attempted first-degree murder; and first-degree burglary. Based upon the jury's verdicts, the trial court arrested judgment with respect to defendant's conviction for first-degree murder based upon the felony murder rule, consolidated defendant's remaining convictions for judgment, and sentenced defendant to a term of life imprisonment without parole. Defendant noted an appeal to the Court of Appeals from the trial court's judgment.

## C. Court of Appeals Decision

¶ 31      In seeking relief from the trial court's judgment before the Court of Appeals, defendant argued that the admission of Deputy Teer's description of Ms. Pichardo's account of the events that occurred at the time of Mr. Guerrero's death as "rock solid"

constituted plain error. *State v. Caballero*, 281 N.C. App. 215, 2021-NCCOA-718, ¶ 13 (unpublished). In rejecting defendant's challenge to the admission of the challenged portion of Deputy Teer's testimony, the Court of Appeals concluded that "the transcript reflects that Deputy Teer testified regarding the consistency of [Ms.] Pichardo's account and recollection, not the credibility or truthfulness of her statements," *id.* ¶ 17, and held that, "[b]ecause Deputy Teer's testimony was limited to corroborating [Ms.] Pichardo's statements and testimony, defendant has failed to show that he was prejudiced" and that "the trial court did not commit plain error in admitting Deputy Teer's testimony," *id.* ¶ 18. On 9 March 2022, this Court allowed defendant's petition for discretionary review of the Court of Appeals' decision.

## II. Analysis

### A. Standard of Review

¶ 32    An issue that was neither preserved by an objection lodged at trial nor deemed to have been preserved by rule or law despite the absence of such an objection can be made the basis of an issue on appeal if the judicial action in question amounts to plain error. N.C. R. App. P. 10(a)(4). Since defendant did not object to the admission of the challenged portion of Deputy Teer's testimony at trial, defendant is only entitled to have this issue reviewed on appeal for plain error. *Id.* Plain error is error that "seriously affect[s] the fairness, integrity[,] or public reputation of judicial proceedings" and is to be "applied cautiously and only in the exceptional case." *State*

*v. Odom*, 307 N.C. 655, 660 (1983) (quoting *United State v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982)). "For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial," *State v. Lawrence*, 365 N.C. 506, 518 (2012) (citing *Odom*, 307 N.C. at 660), with the defendant being required to show "prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty," *id.* (cleaned up). This Court reviews decisions of the Court of Appeals for the purpose of determining whether they contain any error of law. N.C. R. App. P. 16(a).

**B. Admissibility of the Challenged Portion of Deputy Teer's Testimony**

¶ 33        In seeking to persuade us that the admission of the challenged portion of Deputy Teer's testimony constituted plain error, defendant begins by arguing that the issue of whether a witness' testimony is true "is a question of credibility and is a matter for the jury alone." *State v. Solomon,* 340 N.C. 212, 221 (1995). In defendant's view, "[o]pinion testimony about the credibility or the believability" of a witness' testimony "is not admissible even when offered by an expert witness," citing *State v. Hannon*, 118 N.C. App. 448, 451 (1995). According to defendant, the Court of Appeals erred by holding that Deputy Teer's description of Ms. Pichardo's account of the events that occurred at the time of Mr. Guerrero's death as "rock solid" amounted to a characterization of her testimony as consistent with her prior statements rather than the expression of an opinion about the credibility of her testimony, given that

Deputy "Teer's testimony about subjecting [Ms. Pichardo's] narrative account of the events to a 'test of credibility'" could not be properly understood as anything other than the expression of an opinion that she was telling the truth.

¶ 34        After noting that no witness is entitled to express an opinion concerning the defendant's guilt either directly or indirectly, citing *State v. Kim*, 318 N.C. 614, 621 (1986), *State v. Heath*, 316 N.C. 337, 341–42 (1986), and *State v. Galloway*, 304 N.C. 485, 489 (1981), defendant contends that Deputy Teer's description of Ms. Pichardo's account of the events on the night of Mr. Guerrero's death as "rock solid" was nothing more than a backhanded expression of Deputy Teer's opinion that Ms. Pichardo's testimony was credible, with such testimony by a law enforcement officer being particularly harmful to a defendant's chances for a more favorable outcome at trial given that jurors tend to give great weight to testimony given by law enforcement officers, citing *Tyndall v. Harvey C. Hines Co.*, 226 N.C. 620, 623 (1946).

¶ 35        The State, on the other hand, argues that the admission of the challenged portion of Deputy Teer's testimony did not constitute error, much less plain error. According to the State, this Court has repeatedly allowed law enforcement officers to testify concerning prior consistent statements made by other witnesses and has held that an expert witness is entitled "to testify that the victim's allegations did not vary," quoting *State v. Stancil*, 146 N.C. App. 234, 241 (2001), *aff'd per curiam as modified on other grounds*, 355 N.C. 266 (2002). In the State's view, Deputy Teer did not

express an opinion concerning Ms. Pichardo's truthfulness and, instead, simply described the consistency of the statements that Ms. Pichardo had made to him on the night of Mr. Guerrero's death. In the course of analogizing this case to our decision in *State v. Betts*, 377 N.C. 519, 2021-NCSC-68, the State asserts that Deputy Teer said "nothing more than that a particular statement [had been] made" and that Ms. Pichardo's accounts of the event on the night of Mr. Guerrero's death were consistent. *Id.* ¶ 20.

¶ 36    The State further contends that, even if the challenged portion of Deputy Teer's testimony had been improperly admitted, "defendant [had] opened the door to such evidence by putting [Ms. Pichardo's] credibility at issue" and that a party is entitled to elicit evidence concerning a witness' truthfulness after that witness' character for truthfulness has been attacked, citing North Carolina Rule of Evidence 608(a). In the State's view, once a defendant has attempted to discredit a witness' testimony on cross-examination, it is "appropriate and competent to show by the officers that [the witness] had made similar consistent statements to them," quoting *State v. Bennett*, 226 N.C. 82, 85 (1946). According to the State, since defendant's trial counsel "challenged [Ms. Pichardo's] credibility by questioning her about prior, allegedly inconsistent statements," evidence concerning the truthfulness of her testimony became admissible.

¶ 37        A careful review of the record in light of the applicable law persuades us that the challenged portion of Deputy Teer's testimony was inadmissible.  As we have already noted, "it is typically improper for a party to seek to have [ ] witnesses vouch for the veracity of another witness," *State v. Warden*, 376 N.C. 503, 507 (2020) (cleaned up), given that the truthfulness of a particular witness should be determined by the jury rather than by a witness for one party or the other, as the "jury is the lie detector in the courtroom" and "is the only proper entity to perform the ultimate function of every trial—determination of the truth," *Kim*, 318 N.C. at 621 (citations omitted).  In order to enable the jury to evaluate a particular witness' credibility, "[p]rior consistent statements made by a witness are admissible for purposes of corroborating the testimony of that witness, if it does in fact corroborate [that witness'] testimony," *State v. Holden,* 321 N.C. 125, 143 (1987), with "wide latitude" being "grant[ed] to the admission of this type of evidence," *State v. Martin,* 309 N.C. 465, 476 (1983), and with law enforcement officers having been allowed to testify to prior statements that a witness had made for the purpose of enhancing the credibility of that witness, *State v. Walters*, 357 N.C. 68, 88–89 (2003); *State v. Williamson*, 333 N.C. 128, 135–37 (1992); *State v. Lawson*, 310 N.C. 632, 639 (1984); and *State v. Elkerson*, 304 N.C. 658, 666–67 (1982).  In addition, the Court of Appeals has allowed the admission of testimony expressing an opinion that the statements that the victim had made at different points in time did not differ, *see Stancil*, 146 N.C. App. at 241

(stating that an expert may "testify that the victim's allegations did not vary" after describing the statements that the witness actually made).[2] As a result, the ultimate issue raised by defendant's challenge to the admission of the relevant portion of Deputy Teer's testimony is whether that testimony constituted an expression of Deputy Teer's belief that Ms. Pichardo was telling the truth or whether it constituted either a recitation of Ms. Pichardo's prior statements or an expression of opinion that the statements that Ms. Pichardo had made were consistent with each other.[3]

¶ 38   As an initial matter, we cannot accept the assertion that the challenged portion of Deputy Teer's testimony is nothing more than evidence that corroborates Ms. Pichardo's account of the events that occurred at the time of Mr. Guerrero's death. According to well-established North Carolina law, "[a] prior consistent statement of a witness is admissible to corroborate the testimony of the witness whether or not the testimony of the witness has been impeached." *State v. Jones*, 329 N.C. 254, 257 (1991). As is reflected in numerous decisions of this Court, the evidence that is rendered admissible by means of this principle of the law of evidence is evidence concerning the actual statement made by the witness, *Walters*, 357 N.C. at 89

---

[2] As a result of the fact that this Court did not address the correctness of this aspect of the Court of Appeals' decision, *Stancil*, 355 N.C. at 266, we express no opinion concerning the admissibility of such evidence given that, in our view, there is no need to do so in order to decide this case.

[3] Although, as we have already noted, the extent to which one witness is entitled to testify that statements made by another witness were, in the opinion of the first witness, consistent is an open question before this Court, we will assume, without deciding, that such evidence is admissible for the purpose of deciding this case.

(upholding the admission of a "911 tape and Ione Black's statement to Detective Autry" for the purpose of corroborating Ms. Black's trial testimony); *Farmer*, 333 N.C. at 192 (noting that, "to be admissible as corroborative evidence, a witness's prior consistent statements merely must tend to add weight or credibility to the witness's testimony" and holding that any error that the trial court might have committed in admitting "Shields' written statement to Washburn" was harmless"); *Williamson*, 333 N.C. at 135–37 (upholding the admission of "those portions of Agent White's testimony regarding Logan's statements that were objected to" for the purpose of corroborating the trial testimony of Tyrone Logan); *Jones*, 329 N.C. at 256–58 (upholding the admission of testimony by an investigating officer concerning "a written verbatim account of the statement Mr. Sanders had made to him" for the purpose of corroborating Mr. Sanders' trial testimony); *Lawson*, 310 N.C. at 639 (upholding the admission of the testimony "of police investigators relating to Ms. Soden's prior statements to them made before and after defendant's arrest" to "corroborate her in-court testimony"); *Martin*, 309 N.C. at 477 (upholding the admission of an extrajudicial statement by Mark Anthony Owens on the grounds that "the prior statement does corroborate his in-court testimony" after "carefully compar[ing] Owens' in-court testimony with his prior written statement,"); *Elkerson*, 304 N.C. at 666–67 (upholding the admission of testimony by "Deputy Sheriff David Smith and S.B.I. Agent Joe Momier . . . concerning statements made to them by

James Smith which tended to corroborate Smith's trial testimony"); *State v. Medley*, 295 N.C. 75, 77–79 (1978) (upholding the admission of "the prior written statements of Willie James Meaders and Glossie Lee Carter for corroborative purposes"). As a result, what these decisions, and others like them, make admissible is evidence concerning what the witness actually said on a prior occasion without authorizing the admission of what is, in essence, extensive editorial commentary about the relationship between the witness's trial testimony and the extrajudicial statement given that "whether [the extrajudicial statement] in fact corroborated the [witness'] testimony [is,] of course, a jury question. *State v. Ramey*, 318 N.C. 457, 470 (1986); see also *Medley*, 295 N.C. at 79 (stating that "[t]he minor variances complained of do not impair the admissibility of the prior statements for corroborative purposes, but affect only the weight and credibility, which is always for the jury").

¶ 39        The challenged portion of Deputy Teer's testimony, which is that, "[d]espite multiple attempts to give [Ms. Pichardo] the opportunity to expand her story, she didn't," with her "story [having] stayed entirely 100 percent consistent, resolute, and rock solid," bears no resemblance to any evidence that this Court has previously allowed to be admitted for corroborative purposes. Instead of simply reciting the statements that Ms. Pichardo made to him and allowing the jury to determine whether that evidence did or did not corroborate Ms. Pichardo's trial testimony or even stating that the statements that Ms. Pichardo made to him were consistent with

her trial testimony, Deputy Teer engaged in an extensive discussion of a questioning technique that he utilized for the purpose of determining Ms. Pichardo's credibility, which rested upon the theory that a particular witness' tendency to latch on to additional facts suggested by the questioner would be "a red flag [ ] for the credibility of that person." In the context of this discussion of witness credibility, a reasonable juror could have only understood Deputy Teer's description of Ms. Pichardo's performance on the test of credibility that he administered to her as "rock solid" or "unlikely to change, fail, or collapse," *Rock solid*, *New Oxford American Dictionary* (3d ed. 2010), to be an assertion that, since Ms. Pichardo's statements remained consistent in the face of Deputy Teer's repeated attempts to suggest the presence of additional details to her, her account of what had happened on the night of Mr. Guerrero's death should be deemed credible.

¶ 40      The challenged portion of Deputy Teer's testimony at issue in this case is fundamentally different from the evidence at issue in *Betts*, in which we opined that "[a]n expert witness's use of the word 'disclose,' standing alone, does not constitute impermissible vouching as to the credibility of a victim of child sex abuse, regardless of how frequently used, and indicates nothing more than that a particular statement was made." *Betts*, 2021-NCSC-68, ¶ 20. In other words, we concluded in *Betts* that the word "disclose" was nothing more than a term used by the witness to describe the communications that the alleged victim of an act of child sexual abuse made

concerning the defendant's allegedly unlawful conduct and did not have the connotation that the account that the child provided on the occasion in question was an inherently truthful one. *Id.* ¶¶ 18–21. The challenged portion of Deputy Teer's testimony, on the other hand, did, for the reasons set out above, go beyond a recitation of what Ms. Pichardo told him or even an expression of opinion that the statements that she had made to him were consistent with her trial testimony and constituted an expression of Deputy Teer's confidence that the information that Ms. Pichardo had communicated in the statements that she had made to him was credible. As a result, our decision in *Betts* does not support a decision to uphold the admission of the challenged portion of Deputy Teer's testimony.

¶ 41 Similarly, the admission of the challenged portion of Deputy Teer's testimony cannot be upheld as an appropriate response to the fact that defendant had challenged the credibility of Ms. Pichardo's testimony in the course of cross-examining her. Rule 608(a) of the North Carolina Rules of Evidence provides that:

> [t]he credibility of a witness may be attacked or supported by evidence in the form of reputation or opinion as provided in Rule 405(a), but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

N.C.G.S. § 8C-1, Rule 608(a) (2021). Put another way, Rule 608(a) allows the party that called a witness to bolster the credibility of that witness by eliciting evidence

concerning that witness' "character for truthfulness" in the event that the credibility of that witness has been attacked "by evidence in the form of reputation or opinion." In this case, however, defendant did not attack Ms. Pichardo's credibility "by opinion or reputation evidence or otherwise." Instead, defendant attempted to challenge Ms. Pichardo's credibility by pointing out what he believed to be inconsistencies between the information contained in her trial testimony and the statements that she gave to investigating officers.[4] In addition, the challenged portion of Deputy Teer's testimony constituted a direct assertion that Ms. Pichardo had passed the credibility test that he had administered to her rather than "evidence of truthful character." Thus, the admission of the challenged portion of Deputy Teer's testimony cannot be upheld on the basis of N.C.G.S. § 8C-1, Rule 608(a). As a result, for all of these reasons, the challenged portion of Deputy Teer's testimony did not constitute admissible evidence, resulting in the necessity for us to conduct the prejudice inquiry required by our plain error jurisprudence.

---

[4] For example, defendant's trial counsel sought to impeach Ms. Pichardo's testimony that defendant had punched her through the glass door of her residence by pointing out that, according to the transcript of her call for emergency assistance, she "had gone outside and a person punched her in the eye." Similarly, defendant's trial counsel elicited evidence that Ms. Pichardo had failed to tell investigating officers that she had had to run around a car in the driveway while being chased by defendant despite having made such an assertion in her trial testimony. Finally, defendant's trial counsel elicited evidence tending to show, on the one hand, that Ms. Pichardo had a good relationship with Mr. Huerta and had stated to investigating officers that she had no problem traveling to the Durham County Sheriff's Office with Mr. Huerta before asking, on the other hand, how such statements could be consistent with her testimony that Mr. Huerta had been "bothering [her]."

**C. Plain Error**

¶ 42        In seeking to persuade us that the admission of the challenged portion of Deputy Teer's testimony was sufficiently prejudicial to constitute plain error, defendant argues that this Court has tended to find that the admission of testimony that improperly vouches for the credibility of a prosecution witness rises to the level of plain error in the event that the jury's decision to convict the defendant rested almost entirely upon the credibility of that witness, citing *Warden*, 376 N.C. at 507–10, *State v. Hannon*, 118 N.C. App. 448, 451 (1995), and *State v. Holloway*, 82 N.C. App. 586, 587 (1986). According to defendant, the jury's decision in this case hinged upon the manner in which it resolved "the issue of whether to believe the testimony of [Ms. Pichardo] or of [defendant]," with the accounts provided by Ms. Pichardo and defendant being absolutely contradictory. In addition, defendant asserts that the record does not contain any physical evidence tending to connect him to the assault upon Mr. Guerrero, that there were inconsistencies between Ms. Pichardo's trial testimony and the initial statement that she provided to Deputy Teer that served to cast doubt upon the credibility of her identification of defendant as the person who attacked Mr. Guerrero and herself, and that "[t]he State [had] not [been] able to provide any evidence for why [defendant] would want to assault [Mr. Guerrero]." As a result, defendant contends that it was reasonably probable that he would have been

acquitted in the event that Deputy Teer had not been allowed to describe Ms. Pichardo's statements as "rock solid."

¶ 43        The State asserts, on the other hand, that defendant has failed to show that the admission of the challenged portion of Deputy Teer's testimony constituted a "fundamental error" that had a "probable impact" on the jury's verdict, quoting *Lawrence*, 365 N.C. at 518. In support of this assertion, the State claims to have presented overwhelming evidence of defendant's guilt, including Ms. Pichardo's testimony identifying defendant as the perpetrator of the attack upon Mr. Guerrero and herself, the fact that defendant admitted having been present at the time of the assault upon Mr. Guerrero and that Mr. Guerrero's blood was on his pants, and the "bizarre and conflicting accounts [that defendant provided] to police of that night's events," which "[n]o reasonable jury [was likely to] credit." Although the State concedes that the admission of evidence vouching for the credibility of another witness is generally prejudicial in the absence of physical evidence tending to support a finding of guilt, citing *Warden*, 376 N.C. at 504, the State asserts that this principle has no application in this instance given the undisputed evidence that someone knocked on Ms. Pichardo's door that night, that someone stabbed Mr. Guerrero to death, that someone punched Ms. Pichardo through the glass door to her residence; and that Mr. Guerrero's blood had been detected on defendant's muddy pants.

Finally, the State contends that, even if any improper bolstering might have caused prejudice, "that prejudice was cured by the trial court's instructions to the jury."

¶ 44          A careful review of the record satisfies us that it is not reasonably probable that defendant would have been acquitted had the challenged portion of Deputy Teer's testimony not been admitted. Although this Court has held that the opinions of law enforcement officers can carry great weight with the members of a jury, *Tyndall*, 226 N.C. at 623 (stating that "[t]he witness was a State [highway patrolman] whose duty it was to make a disinterested and impartial investigation" and whose "testimony should, and no doubt did, carry great weight with the jury"), that fact alone does not suffice to necessitate a finding of plain error in this case given the strength of the State's case against defendant. Among other things, the record reflects that Ms. Pichardo had had ample previous opportunities to observe defendant, so there can be little room to doubt that she knew who he was. In addition, the record reflects that Ms. Pichardo consistently identified defendant as the person who attacked Mr. Guerrero and herself on the evening in question during her call for emergency assistance, her statements to investigating officers, and her trial testimony. Furthermore, the DNA test results admitted into evidence provided near conclusive proof that, contrary to some of his initial statements to the emergency assistance dispatcher and investigating officers, defendant had been present at the time of Mr. Guerrero's murder and had Mr. Guerrero's blood on his muddy jeans.

Similarly, defendant provided conflicting accounts to police concerning what had allegedly happened on the night of Mr. Guerrero's death that included differing descriptions of the race or ethnicity of the two men that he claimed to have attacked Mr. Guerrero and both an admission and a denial that he had approached Mr. Guerrero in the immediate aftermath of the stabbing. Finally, the record contains physical evidence tending to show that a criminal assault had been committed upon both Ms. Pichardo and Mr. Guerrero on the night of Mr. Guerrero's death, including the injuries that Ms. Pichardo, Mr. Guerrero, and their son sustained; the broken glass associated with the door to the residence that Ms. Pichardo, Mr. Guerrero, and their son occupied; and the presence of defendant's blood on Mr. Guerrero's muddy pants. Thus, given the strength of the State's evidence of defendant's guilt and the dubious credibility of defendant's denial of any involvement in the attacks that were perpetrated against Ms. Pichardo and Mr. Guerrero, we are unable to say that there is a reasonable probability that defendant would have been acquitted in the event that Deputy Teer had not been allowed to testify that Ms. Pichardo's account of the events that occurred at that time was "rock solid." As a result, we hold that the trial court did not commit plain error by allowing the admission of the challenged portion of Deputy Teer's testimony.

### III.    Conclusion

Thus, for the reasons set forth above, we hold that, while Deputy Teer should not have been allowed to testify that Ms. Pichardo's account of the events that occurred on the evening of Mr. Guerrero's death was "rock solid," the admission of the challenged portion of Deputy Teer's testimony did not constitute plain error. As a result, we modify and affirm the Court of Appeals' decision in this case.

MODIFIED AND AFFIRMED.

Justice BARRINGER dissenting in part, concurring in result.

¶ 46    I agree with the majority that there is no plain error. The majority opined that Deputy John Teer's testimony would have been inadmissible if the objection had been raised. Further, Deputy Teer's testimony was admissible because it merely corroborated Liliana Pichardo's ("Ms. Pichardo") testimony. For that reason, I respectfully dissent in part and concur in result.

¶ 47    At trial, Ms. Pichardo testified that she saw defendant Efren Ernesto Caballero, who was wearing a black sweatshirt with a zipper, attack her husband. He then attacked her. After Ms. Pichardo gave her testimony, Deputy Teer testified that Ms. Pichardo gave him a description of her attacker. Deputy Teer testified further that she told him that her attacker was "her neighbor, Mr. Caballero," and he was wearing "a dark jacket or a dark hoodie with a zipper." However, when Deputy Teer saw defendant at the scene of the incident, defendant was wearing a white hoodie with stripes. Deputy Teer testified that after he informed Ms. Pichardo that defendant, Mr. Caballero, "was wearing a white hoodie with stripes on it," Ms. Pichardo, with "no hesitation," responded that defendant must have changed his clothes. Deputy Teer testified that Ms. Pichardo's "instant" response "stuck in [his] head" because "she knew who [the attacker] was."

¶ 48    The State then asked Deputy Teer why that stuck in his head and why he pushed Ms. Pichardo to be certain about defendant's clothing. Deputy Teer responded,

I pushed her on that because frequently, based on my training and experience, I know that if you're talking to a witness and they will change [their] story as you suggest things. I mean, it reduces their credibility if you say, well, this -- how about this; and they go with that. Oh, yeah, it could have been that, yeah, I think he was wearing that. That's a red flag right there for the credibility of that person.

But this stuck out because she stuck to her story. She was resolute and rock solid, never wavered, never changed what she was saying. She knew who her attacker was. She knew what he was wearing. And when I tried to say, hey, it couldn't be that, he's not wearing what you just told me, she said, well, obvious[ly], he changed. He changed his clothing.

The same thing, I also pressed her did you see a weapon; did you see a gun; did you see a knife; was he maybe holding it and you can barely see it. I was trying to give her an opportunity to say, yeah, yeah, I think I saw a knife, I think I saw a gun. She didn't. She said she never saw a weapon. At one point she said, well, his hand was in his pocket, but there -- she did not say that she saw a gun or a knife when I was talking with her.

Despite multiple attempts to give her the opportunity to expand her story, she didn't. Her story stayed entirely 100 percent consistent, resolute[,] and solid.

¶ 49 This Court has established that a witness's prior consistent statements are admissible as corroborative evidence. *State v. Walters*, 357 N.C. 68, 88–89 (2003) ("It has been well established in this state that '[a] prior consistent statement of a witness is admissible to corroborate the testimony of the witness whether or not the witness has been impeached,' even though the statement was hearsay.") (alteration in

original) (quoting *State v. Jones*, 329 N.C. 254, 257 (1991)). Such statements are admissible as long they "merely . . . tend to add weight or credibility to the witness'[s] testimony." *Id.* at 89 (quoting *State v. Farmer*, 333 N.C. 172, 192, (1993)). However, a witness typically cannot vouch for the credibility of another witness. *See, e.g.*, *State v. Robinson*, 355 N.C. 320, 334–35 (2002) (stating that it is improper for a witness to "vouch for the veracity of another witness"). "[I]t is the province of the jury . . . to assess and determine witness credibility." *State v. Hyatt*, 355 N.C. 642, 666 (2002).

¶ 50      Here, Deputy Teer's testimony when read in context—that Ms. Pichardo "never wavered and was rock solid"—merely established that Ms. Pichardo's trial testimony was consistent with her numerous prior statements. Surrounding the statement that Ms. Pichardo was "rock solid," Deputy Teer made the point that she "stuck to her story;" she "stayed entirely 100 percent consistent, resolute and solid;" she "never changed what she was saying;" and "she was sure and never deviated." Deputy Teer was not vouching for her credibility because he did not testify that Ms. Pichardo was telling the truth, simply that she did not vary her account. Since Ms. Pichardo's statements remained consistent in the face of his repeated attempts to suggest additional details, this "stuck in his head." His testimony did nothing more than corroborate Ms. Pichardo's testimony with her prior statements. His testimony in no way impeded the jury's ability to make a credibility determination about Ms.

Pichardo's testimony. Thus, Deputy Teer's testimony was not vouching for Ms. Pichardo's testimony and therefore was proper.

Accordingly, I respectfully dissent in part and concur in result.

Chief Justice NEWBY and Justice BERGER join in this dissenting in part and concurring in result opinion.